317 So.2d 732 (1975)
Jack WILSON et al., Petitioners,
v.
Jack SANDSTROM, Director, Department of Corrections and Rehabilitation, Dade County, Florida, et al., Respondents.
FLORIDA GREYHOUND OWNERS & BREEDERS ASSOCIATION, INC., a Florida Corporation, et al., Appellants,
v.
WEST FLAGLER ASSOCIATES, LTD., a Florida Limited Parnership, Appellee.
Nos. 47674, 47737.
Supreme Court of Florida.
July 21, 1975.
Rehearing Denied July 29, 1975.
*734 Richard A. Pettigrew and Guy B. Bailey, Jr. of Pettigrew & Bailey, Miami, for petitioners-appellants.
Robert L. Shevin, Atty. Gen., and James Dudley Whisenand, Asst. Atty. Gen., and Marion Sibley of Sibley, Giblin, Levenson & Ward, Miami Beach, and Patton, Kanner, Nadeau, Segal, Zeller & LaPorte, Miami, for respondents-appellees.
ADKINS, Chief Justice:
This is an original proceeding in habeas corpus wherein 18 owners of racing greyhounds seek relief from incarceration resulting from violation of an injunctive order of the circuit court entered July 8, 1975. A return to the petition has been filed.
We also have under consideration a review by interlocutory appeal of an order of the circuit judge entered July 3, 1975, granting a mandatory temporary injunction. Our jurisdiction was determined in Wilson v. Sandstrom, Case No. 47,674, opinion filed July 17, 1975.
For clarity, West Flagler Associates, Ltd., the owner and operator of the race track is hereinafter referred to as Flagler; the owners of the greyhounds used at the race track are referred to as the kennel owners.
Flagler instituted suit against the kennel owners and a kennel owners' association seeking a temporary and permanent mandatory injunction requiring the defendants to comply with contracts for furnishing greyhounds to the race track commencing July 3, 1975. The State of Florida and Metropolitan Dade County were allowed to intervene as parties-plaintiff.
Flagler alleged that under the contract it granted exclusive right to the named kennel owners to race their dogs and agreed to furnish purses, and that Flagler has complied with the contract. Flagler was licensed to operate from July 3, 1975, through September 4, 1975, from November 1, 1975, to January 9, 1976, and from May 1, 1976, to July 2, 1976. The contracts between Flagler and the kennel owners *735 encompass these dates and were identical as to form.
Under the contracts the kennel owners agreed not to take any action which would be detrimental to the race track and greyhound racing. It was specifically provided that the kennel owners would not do any act which would bring about a temporary or permanent cessation or suspension of racing during the period of time covered by the contract.
It was alleged that under the rules of the Department of Business Regulation the kennel owners were required to present their dogs for schooling in June for the race meet commencing July 3, 1975. On June 10, 1975, the kennel owners threatened Flagler with indeterminate action. As a result, Flagler alleges it would be unable to conduct its race meet; that the kennel owners are required to supply "chattel of unusual and unique character; namely racing greyhounds which are not readily obtainable in the ready market". Flagler alleges that it will not be able to get the owners to supply greyhounds and suffers irreparable damage for each day it is not open. It was also alleged that, if notice were given the dog owners, the dogs may be removed from the jurisdiction.
Pursuant to the sworn complaint, the court, on June 30, 1975, without notice, issued a temporary injunction restraining removal of the dogs from the jurisdiction and ordered a hearing to be held on July 3, 1975. On July 3, 1975, the kennel owners appeared and announced that a petition for removal to the Federal court had been filed. Therefore, they would not participate in the hearing. Their request for permission to withdraw from the hearing was granted.
At 5:55 p.m. on July 3, 1975, the Federal court of its own motion remanded the cause to the State court. The State court was still in session at the time of the entry of the order of remand and at 6:10 p.m. on July 3, 1975, an order was entered granting the temporary mandatory injunction. This order recited that the State of Florida was suffering a loss of tax revenue of $64,000 per day, and that Flagler was suffering irreparable damage because of the kennel owners' refusal to supply dogs. The court ordered immediate compliance with the contracts by the filing of entries not later than July 4, 1975, at 10:00 a.m.; that upon refusal of the kennel owners to file entries that Perrine Palmer take custody and control of the dogs for the purpose of running them.
The kennel owners refused to submit their entry and Palmer attempted to take control of the dogs. Because of the number of dogs and inability to get adequate help, a hearing was held at the request of the receiver on July 5, 1975. Custody of the dogs was thereupon returned to the kennel owners, who were informed that a contempt hearing would be held on Monday, July 7, 1975.
On the morning of July 7, 1975, prior to the contempt hearing, the kennel owners filed a notice of interlocutory appeal seeking review of the order of July 3, 1975. This appeal has been transferred to this Court.
At the hearing on July 7, 1975, each kennel owner was called to the stand and interrogated concerning his knowledge of the order and whether he had willfully and deliberately refused to comply with the order of July 3, 1975. On July 8, 1975, the kennel owners were adjudged guilty of contempt and 18 of them were incarcerated in the Dade County penal facilities. These are the petitioners in the habeas corpus proceeding.
The kennel owners say that the order of July 3, 1975, imposing a mandatory injunction exceeded the jurisdiction of the circuit court. It is contended the mandatory injunction could not be granted until after final hearing, citing F.E.C. Railway Co. v. Taylor, 56 Fla. 788, 47 So. 345 (1908), and Montgomery Pipe & Tube Company v. Mann, 205 So.2d 660 (Fla.App.3d 1968). Flagler says that temporary mandatory injunction *736 may be granted where it appears that plaintiff has a clear right to invoke the remedy free from reasonable doubt.
In Kellerman v. Chase & Co., 101 Fla. 785, 135 So. 127 (1931), Chase & Co. had purchased a crop of tomatoes by contract from Kellerman and others. Upon the failure to deliver, Chase & Co. applied to the circuit court and secured a temporary mandatory injunction requiring Kellerman to deliver the tomatoes. In upholding the validity of the temporary mandatory injunction, this Court said:
"It is a general rule that a mandatory injunction can only be properly granted on a final hearing, as its effect before that time is like awarding execution before trial and judgment. See Fla. East Coast Rwy. Co. v. Taylor, 56 Fla. 788, 47 So. 345, and cases there cited. However, in this case it not only appears that the plaintiff has a clear right free from reasonable doubt to invoke the remedy, but it also appears that to delay the remedy would necessarily involve a denial of the right because it is shown positively by both the allegation of the bill and the proof submitted that the tomato season covers a period of only some five or six weeks, and it is a matter of common knowledge that the tomato crop is of the most perishable character.
"In Zetrouer v. Zetrouer, 89 Fla. 253, 103 So. 625, 626, this court, speaking through Mr. Justice Terrell, said:
`It is well settled that mandatory injunctions are rarely granted before final hearing, or before the parties have full opportunity to present all the facts in such manner as will enable the court to see and judge what the truth may be; however, instances are not wanting where relief by mandatory injunction was granted on the proper showing made. Taylor v. Florida East Coast R.R. Co., 54 Fla. 635, 45 So. 574, 16 L.R.A. (N.S.), 307, 127 Am.St.Rep. 155, 14 Ann.Cas. 472; Florida East Coast R. Co. v. Taylor, 56 Fla. 788, 47 So. 345; City of Ocala v. Anderson, 58 Fla. 415, 50 So. 572; 14 R.C.L. 317.'"
A mandatory temporary injunction may be issued requiring specific performance of a contract. Bowling v. National Convoy and Trucking Co., 101 Fla. 634, 135 So. 541 (1931). See also, Price v. Gordon, 129 Fla. 715, 177 So. 276 (1937). In Daniel v. May, 143 So.2d 536 (Fla.App.2d 1962), a mandatory temporary injunction was issued to require the defendants to remove a building encroaching on a setback line.
We conclude as a general rule, that a temporary mandatory injunction is proper where irreparable harm will otherwise result, the party has a clear legal right thereto, and such party has no adequate remedy at law. In the case sub judice we are confronted with a fourth consideration, i.e., the public interest.
Public consideration was specifically recognized by the Court in F.E.C. Railway Co. v. Taylor, supra, cited by the kennel owners, when the Court declined to issue a mandatory temporary injunction to force the railroad to build a spur track and depot. The rationale for not issuing the injunction was the detriment to the paramount public interest.
State Road Department of Florida v. Fugoli, 123 So.2d 473 (Fla.App. 1st 1960), involved a situation where the State sought such an injunction for the removal of property encroaching on the public right of way. The appellate court in holding that mandatory injunctive relief was appropriate, said:
"The relief contemplated should be readily available where the public right or injury to many is concerned, and is to be distinguished from those cases where injunctive relief may be deferred without undue hardship pending the result of an action at law. Such considerations drive *737 to the very heart of the inherent power of courts of equity to provide the type of relief here sought. 123 So.2d at 475."
In Zetrouer v. Zetrouer, supra, this Court affirmed the issuance of a mandatory temporary injunction to require defendants to open a road and remove a fence.
The record clearly shows that Flagler had a clear legal right to the issuance of an injunction and that irreparable harm would result if such injunction were not issued. Also, the State of Florida, through the loss of an estimated $64,000 a day in revenue, is irreparably harmed in that there is no other source to offset this loss of revenue. Furthermore, the State is losing the confidence of the public in its ability to properly regulate the gambling activities in pari-mutuel wagering. The State Deputy Economist testified to the tremendous impact that greyhound pari-mutuel revenue loss will have upon the budgets of the State and counties. The Finance Director of Dade County submitted an affidavit stating that the budget for the county fiscal year beginning October 1, 1975, had been established in reliance upon the continued receipt of funds derived in part from pari-mutuel dog racing activities in Dade County.
Furthermore, the State of Florida has granted to Flagler specific dates for racing  July 3rd to September 4th. Once these racing days are lost, they may be lost forever, as another track is scheduled to open on the day Flagler is scheduled to close. In addition, the damage to Flagler in the minds of the public resulting from this boycott and refusal of the kennel owners to perform their contracts cannot possibly be measured in dollars and cents.
There is no adequate remedy at law. The trial court, sitting as a court of equity, certainly had the power and authority to protect the public interest or rights and also to avoid injury to many who are concerned with the continued operation of the track and the receipt of funds from the pari-mutuel revenues.
Regardless of the authority of the court to enter such an injunction, the kennel owners say that the contract is primarily one for a personal service and incarceration for failure to comply with the provisions of a contract requiring personal services amounts to involuntary servitude, thereby violating the provisions of the United States Constitution, Thirteenth Amendment, § 1. We must first consider whether the contract does, in fact, relate to personal services.
In considering the contracts and the rules of the Board of Business Regulation relating to greyhound racing (Ch. 7E-2), it appears that the kennel owners had a contractual obligation to produce racing greyhounds at the track, while all things relating to the registration, training, etc., of the greyhounds prior to production of the greyhounds were prescribed and limited by the rules and regulations of the Board of Business Regulation.
The owners of greyhounds have no control over the greyhounds after they are brought to the track for a race. According to the rules, an owner must bring the greyhound to the track at least one hour before post time of the first race of each program of each day. Rule 7E-2.14(3). The greyhound is then weighed in and placed "in lock out kennels under the supervision of the paddock judge and no owner or other person excepting the paddock judge, veterinarian, kennel master, scales clerk, lead out, judges or commission representatives shall be allowed in or near the lock out kennel". Rule 7E-2.14(12). This means that the representative of the kennel owner is required by rules of the Board of Business Regulation to present his greyhound to Flagler at least one hour before the first race. The greyhound is then placed in a lock out pen, and no person is permitted to approach that pen except officials designated by the rules.
*738 Thereafter "under the supervision of the paddock judge, the kennel master shall unlock the lock out kennels immediately before weigh-in time to see that the kennels are in perfect repair and that nothing has been deposited in any of the kennels for the greyhounds' consumption ..." Rule 7E-2.15(3). This means that just prior to the race the official of the Department of Business Regulation or those designated by the rules will unlock the lock out pen, inspect the greyhounds and thereafter they will be re-weighed and the identification re-inspected. The greyhounds are led to the starting post by grooms provided by the track operation and licensed by the Department. Rule 7E-2.16.
It thus appears that under the rules regulating greyhound racing, the owner, trainer, or helper or agent of the owner has absolutely nothing to do with the greyhound except to present it to Flagler at least one hour before the first race. The owner's responsibility for the condition of the dog is established and regulated by the rules relating to greyhound racing. The contracts make no changes in this responsibility. The duties and obligations of the owners and trainers relative to the training and schooling of the greyhounds are to the State, not to Flagler. The kennel owners supply a unique product, not readily obtainable on the market, and the contract merely provides that this unique product be produced by the kennel owner at a specified time.
A contract is properly considered a personal service contract when it involves one such as a football player or boxer signing to perform a game or a match. In the case sub judice the kennel owners simply contracted to furnish greyhounds properly schooled and trained under the regulations of the State of Florida for racing purposes at Flagler. A greyhound is not a "party" as provided in the United States Constitution, Amendment Thirteen, § 1.
Even if we assume that some personal service is involved in the requirement that the kennel owners produce their unique product, temporary relief should nevertheless be granted. As stated in 17 Fla.Jur., Injunctions, § 37, pp. 397, 398:
"Contracts of Service.
Many of the cases in which equity has been asked to enjoin a breach of contract arise from disputes concerning contracts for personal services. Underlying the exercise of the injunctive power in such cases is the difficulty of replacing such service, and the inadequacy of damages as compensation for such loss. Injunctive relief, therefore, is often invoked to prevent violation of contracts calling for personal services or acts of a special character, or for such services by persons of eminence in their calling, possessing special qualifications. It follows clearly that reasons for equitable intervention are wholly lacking in cases of ordinary employment, where no personal contract or peculiar influence of the employee over the customers of his employer exists, and where the services are without special merit and are such as can be readily supplied or obtained from others without much difficulty or expense. In such cases injunctive relief will be denied."
Some of the contracts under consideration were executed more than a year prior to the beginning of the racing season, but all were executed at least five months prior to the beginning of the racing season. On June 10, 1975, the kennel owners advised Flagler by Notice of Intent dated June 10, 1975, as follows:
"We the undersigned representatives of the attached list of kennel owners at West Flagler Associates Limited, have been authorized to serve you with this notice in accordance with Greyhound Racing Rules and Regulations # 7E 2.02(21)(b).
"Please be advised that we wish to enter into immediate negotiations on all matters between the kennel owners and the track, relating to the meet which commences *739 at your track on July 3, 1975. The purpose of this notice is to advise you and the State of Florida, that in the event you refuse to negotiate these matters in good faith, that the individual kennel owners may take such action which may affect the public welfare, and such action may be taken on or after June 25, 1975."
Obviously, the underlying reason for breach of the contract was hope for better provisions. There is no allegation or contention relating to fraud or duress in the execution of the contract. Flagler seeks the enforcement of the contract while the kennel owners demand that the terms be re-negotiated.
The case sub judice is not similar to Pinellas County Classroom Teachers' Association, Inc. v. Board of Public Instruction, 214 So.2d 34 (Fla. 1968), where an order of the trial court enjoining public school teachers from striking and giving them alternatives of working and complying with their contracts, or terminating their contracts, was affirmed by this Court. A "strike" contemplates employment. The kennel owners are independent contractors, fitting the definition in 17 Fla. Jur., Independent Contractors, § 2, p. 174:
"Another commonly accepted definition is that an independent contractor is one who, in the exercise of an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer except as to the product or result of his work.
"The difference between an independent contractor and a servant is well recognized, the chief distinction being the right of control over the work."
The kennel owners contracted to provide greyhounds which were properly trained and schooled under State regulations. They were not subject to the control of Flagler except as to the product or result of their work. When the greyhounds were delivered to the track, the kennel owners exercised no further control over the greyhounds. This relationship contains all the elements of an independent contractor as opposed to an employee.
The kennel owners say that the contract does not contain sufficient mutuality of obligations so as to allow it to be enforced by mandatory injunction. The terms of any contract should be such that at least some of them might be enforced against the other party to the contract. As stated in 17 Fla.Jur., Injunctions, § 35, p. 396:
"For the injunctive remedy to apply to restrain the breach of a contract, the contract must be certain and unambiguous in its terms. Further, the contract should be one in which there is mutuality of remedy as well as of obligation. That is, the terms must be such that equity might enforce at least some of them against the other party to the contract. This does not mean, however, that each party need have precisely the same remedy in form, effect, or extent. A mere difference in rights stipulated does not necessarily destroy mutuality of remedy. Thus the fact that a lease is terminable at the option of one party only does not preclude that party from enjoining a breach of its terms by the other."
The contracts in question give the kennel owners the right to withdraw dogs providing adequate notice of the reasons for the withdrawal is given to the track. The track cannot arbitrarily refuse the owners' withdrawal or substitutions. It also provides that in the event of the withdrawal of dogs, either the track operator or the kennel owner may pursue any legal or equitable remedy, including a complaint to the State of Florida.
The contract is clear and unambiguous as to its terms. In consideration of the kennel owners' agreement to furnish the dogs, the track owner is required to accept *740 the dogs tendered by the kennel owners and pay to the kennel owners a specified consideration for the furnishing of the dogs.
The contract does not give any party unbridled discretion to do or refuse to do any act. The kennel owners could enforce the contract just as Flagler. The contention that there is lack of mutuality is without merit.
The kennel owners contend that the notice of interlocutory appeal directed to the order granting the mandatory injunction automatically stayed the mandatory injunction and the subsequent hearing and order holding the kennel owners in contempt was erroneous or void.
Under general law, in other jurisdictions, a mandatory injunction is automatically stayed by an appeal from the order or decree granting it. 42 Am.Jur.2d, Injunctions, § 348. An annotation entitled, "Stay of Injunction by Appeal", 93 ALR 723, recognized that Florida General Statutes of 1920, § 2922 and § 3170, departed from the general rule and provided that any injunction could be suspended if authorized by supersedeas order of the court. This statute was incorporated in F.S. § 59.13, which, in turn, was incorporated as Rule 5.1, Florida Appellate Rules, which provides as follows:
"When it shall be made to appear to the lower court that an appeal to review an interlocutory order or decree in equity has been or is about to be taken to the Court, the lower court may, in its discretion, grant a supersedeas or stay upon appellant's giving a good and sufficient bond conditional that such appeal shall be taken within 10 days, and to pay all costs, damages and expenses occasioned by reason of the stay of proceedings, together with such other and further conditions as may be fixed by the lower court in the event the order or judgment of which a review is sought is not quashed, modified or reversed."
Under this rule the interlocutory appeal would not operate as an automatic stay of the temporary mandatory injunction. An application for supersedeas must be made to the trial court or to the District Court of Appeal.
The kennel owners sought a stay from the trial court and in the District Court of Appeal, Third District, which were denied. Under our rules of procedure a mandatory injunction is not automatically stayed by an appeal, but only upon supersedeas.
City of Miami v. Cuban Vill-Age Co., 143 So.2d 69 (Fla.App.3d 1962), cited by the kennel owners, involved an appeal from orders prohibiting certain actions by the City and compelling other actions. The court held that the notice of appeal was effective to stay the operation of a mandatory injunction. The City was not required to furnish a supersedeas bond under a then existing statute, so the formal application for a supersedeas was unnecessary. However, a litigant who may be required to post a bond must, of course, make formal application for a supersedeas in order to gain a stay.
In the case sub judice the interlocutory appeal did not operate as an automatic stay of the temporary mandatory injunction.
The kennel owners say the attempted Federal removal ousted the trial court of jurisdiction and the order granting the mandatory injunction on July 3rd was erroneous. When removal is shown to be improper the State court's actions are not void. F & L Drug Co. v. American Central Ins. Co., 200 F. Supp. 718 (Dist.Ct. Conn. 1961).
In Metropolitan Casualty Ins. Co. v. Stevens, 312 U.S. 563, 61 S.Ct. 715, 85 L.Ed. 1044 (1941) the Supreme Court rejected a similar argument. Although that case proceeded under an earlier version of the removal law, the jurisdictional proscription was similar:
"While the opinion does not expressly consider the effect of a petition for removal on subsequent proceedings in the state court, the clear import of the decision *741 is that the proceedings are valid if the case was not in fact removable.
......
"The rule that proceedings in the state court subsequent to the petition for removal are valid if the suit was not in fact removable is the logical corollary of the proposition that such proceedings are void if the cause was removable. 312 U.S. at 566, 61 S.Ct. at 717."
Furthermore, in 76 C.J.S. Removal of Causes § 239, it is stated:
"Where the right to remove a cause from a state court to a federal court does not in fact exist, and after an attempted or colorable removal the cause is remanded by the federal court for want of jurisdiction, the jurisdiction of the state court is to be regarded as never having been lost, the federal court never having acquired jurisdiction; or at most the state court is said to have merely had its jurisdiction suspended during the period of the attempted or colorable removal of the cause. Proceedings had in the state court after the attempted removal and pending the remand are generally held to be valid and effectual, except, perhaps, where such proceedings were in violation of an injunction lawfully issued by the federal court; but there is authority to the contrary."
In the case sub judice the cause is remanded to the State court within hours after the petition for removal was filed. The cause was remanded at 5:55 p.m. on July 3rd and the injunction order was entered at 6:10 p.m. on July 3rd, after the cause had been remanded. The trial court had jurisdiction.
We conclude that the order of July 3, 1975, granting the mandatory injunction was within the jurisdiction of the court and error has not been shown. We also conclude that the trial court had jurisdiction to consider the contempt proceedings of July 8th.
The record clearly demonstrates that the kennel owners willfully and deliberately violated the injunctive order of the court. The courts and judges have inherent power by due course of law to punish by appropriate fine or imprisonment or otherwise any conduct that in law constitutes an offense against the authority and dignity of a court or a judicial officer in the performance of judicial functions. State ex rel. Buckner v. Culbreath, 147 Fla. 560, 3 So.2d 380 (1941). The sole reason for the incarceration of the kennel owners was their willful failure to comply with the temporary injunctive order of the court. Just as in any other contempt proceedings, the kennel owners carry the keys of their prison in their own pocket. Demetree v. State, 89 So.2d 498 (Fla. 1956).
In an effort to renegotiate an existing contract by ignoring an injunctive order of the judiciary, the kennel owners have gravely affected the public interest, the revenue of the State of Florida and the revenue of individual counties. Misunderstandings among parties should be adjusted where possible without litigation, for a fair settlement is preferable to a good law suit. On the other hand, the judicial process is always available in the event the fair settlement is not reached. When the judicial process is involved, all parties are bound by the orders and judgments of the court having jurisdiction until such orders or judgments are reversed or modified by an appellate court. Although the kennel owners may feel justified in their complaints, their course of action in depriving the State and the counties of needed revenue certainly warrants the actions of the trial court. Their business is profitable only by virtue of a State statutory permission to operate dog tracks guided by regulatory measures adopted by the State. It might be said they are "biting the hand that feeds them".
In summary, we hold that all of the orders entered by the trial court were proper under the circumstances and without error. The writ of habeas corpus is discharged *742 and the petitioners therein are remanded to the custody of respondent, such incarceration to begin on Tuesday, July 22, 1975, at 5:00 p.m.
The orders of the trial court reviewed by interlocutory appeal are affirmed.
All litigation has been carefully considered, and, in view of the public interest involved, the time for filing a petition for rehearing is limited to Wednesday, July 23, 1975, at 5:00 p.m. However, this decision and order shall be effective forthwith and the granting of this privilege of rehearing shall not operate as a stay of any proceedings in this cause.
It is so ordered.
ROBERTS, OVERTON and ENGLAND, JJ., concur.
BOYD, J., concurs in part and dissents in part with opinion.
BOYD, Justice (concurring in part and dissenting in part).
I concur in that portion of the majority opinion holding that courts should not permit defiance of lawful orders and that the urgent public economic interests involved here require speedy and conclusive action. It is obvious that the racing contract for the Flagler Track has been broken, and I agree that those responsible should be held liable. Determination of liability should be made at an early date, and in the meantime this Court should authorize the Flagler Track to operate with other dogs, if the parties should be unable to reach an agreement suggested by counsel for the owners during argument at this Court, whereby the dogs would run with sufficient proceeds being placed in the registry of the Court until final determination of the rights of the parties thereto shall be made.
I respectfully dissent to that portion of the majority opinion which authorizes specific performance of the racing contracts by the owners, as I feel this constitutes involuntary servitude in conflict with the Thirteenth Amendment to the Constitution of the United States. In expressing this view I recognize that in some instances courts may require specific performance, but the unique nature of the services involved by the owners, handlers and trainers in the instant case is such as to place them under the protection of the Thirteenth Amendment.

ORDER
Petition for Rehearing is denied. Our opinion is not res judicata to the main proceeding of this cause and is without prejudice for the petitioners and appellants to raise in the main proceeding the issues presented herein, including claims for damages for an improperly issued temporary injunction and the enforcement thereof.
ADKINS, C.J., and ROBERTS, BOYD, OVERTON and ENGLAND, JJ., concur.